# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
October 22, 2014 Session

## BUDDY J. WEBB, ET AL. V. BRENT DOUGLAS, ET AL.

**Appeal from the Chancery Court for Benton County**
**No. 2206     Ben H. Cantrell, Senior Judge**

_____

### No. W2014-00299-COA-R3-CV - Filed December 9, 2014

_____

Landowners, whose properties abut a gravel road that crosses over the land of another, claim the right to use that road for ingress and egress. The trial court found the gravel road was formerly a public road, but that the road ceased being a public road at some point. Once the road ceased being a public road, the trial court found the landowners whose land abutted the road had a permanent easement and right to use the road for ingress and egress purposes. The landowners over whose property the road crosses appealed. We affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and DAVID R. FARMER, SP. J., joined.

Phillip G. Hollis, Camden, Tennessee, for the appellants, Brent Douglas and Jennifer Douglas.

Douglas Thompson Bates, III, Centerville, Tennessee, for the appellees, Buddy J. Webb and Shelby E. Webb.

## OPINION

### FACTUAL BACKGROUND

Buddy J. Webb and his wife, Shelby E. Webb, own four parcels of unimproved real property in Benton County, Tennessee. They purchased the first parcel ("Webb #1") in 1969, the second parcel ("Webb #2") in 1977, the third parcel ("Webb #3") in 1986, and the fourth parcel ("Webb #4") in 1997. When they purchased Webb #1, the Webbs used a gravel road

to access their property. The gravel road originates from a paved road that was then known as Marvin Hicks Road, but which later became known as Old Natchez Trace Trail. Old Natchez Trace Trail is to the north of all the properties at issue.[1] The gravel road crosses over another's property before crossing into Webb #1. On December 2, 2009, Brent and Jennifer Douglas purchased the land over which the gravel road crosses. The portion of the gravel road that passes through the Douglases' property is the focus of the dispute between the Webbs and the Douglases.

From where it meets with Old Natchez Trace Trail, the gravel road passes in a southeasterly and then southerly direction through the western edge of the Douglases' property before crossing into the Webbs' property. Once the road enters the Webbs' property, the road follows the border between Webb #2 and Webb #4, going in a southwesterly direction, until it passes through the southeast corner of Webb #1, where it goes from a southwesterly to a southeasterly direction. The road appears to terminate in the northern portion of Webb #3, near a structure that was formerly used as a dwelling, but that is now in a state of disrepair. Mr. Webb testified that, from the time he purchased Webb #1 in 1969 until the Douglases' interference with his use in late 2009 or 2010, he continuously used this gravel road to reach his properties. Webb #1 borders Old Natchez Trail Trace (f/k/a Marvin Hicks Road), but Mr. Webb explained that Fourteen Creek passes through Webb #1 from north to south, and "there's no access across Fourteen Creek." There was no evidence that any road other than the gravel road at issue provides access to the back portion of Webb #1, on the eastern side of Fourteen Creek, or to the other three parcels the Webbs purchased over the course of twenty-eight years. Mr. Webb testified, "I've always used [the road] for whatever need that I had in my farming, my business operations, and for pleasure." When asked whether he ever asked permission to use the road where it crosses over property other than his own for the purpose of entering or leaving his property, Mr. Webb responded, "No, sir."

The only portion of the gravel road that is in dispute is the portion that crosses the Douglases' property. Mr. Webb testified that the gravel road is the only road he can use to reach Webb #2, Webb #3, or Webb #4. When the Webbs purchased Webb #1 in 1969, Mr. Webb believed the gravel road was a county road. Mr. Webb testified that when he and his wife purchased Webb #3 in 1986, a family was living in the structure that is currently in a state of disrepair. Mr. Webb was asked whether the family ever asked his permission to cross his property to reach their home or to leave the property, and Mr. Webb replied, "They did not." Mr. Webb stated that a girl of school age lived at the house and that a school bus

---

[1] A diagram of the Webbs' and the Douglases' properties is included at the end of this opinion. The gravel road is depicted as a dotted line and begins at point A, where the road meets Old Natchez Trace Trail, and ends at point B, which is the northern border of Webb #3.

regularly drove down the gravel road to pick the child up in the morning and to drop the child off in the afternoon.

In response to questions about others' use of the gravel road, Mr. Webb testified that he used to see "county equipment on the road" before the gate was put up where the gravel road meets Old Natchez Trace Trail. Mr. Webb explained:

A: [I]n the operation of my farming equipment and my logging equipment and my in and out, why, through the years I have observed a school bus and the county on it and other people.

Q: Well that was going to be my next question. Did the road, when you first became familiar with it, did it go past where the house is now that's shown on the exhibit or did it stop there?

A: The gravel section, the useable section, stopped at the house there. . . .

Q: Okay. Now, did you see other people using the road, going up and down it?

A: Yes, sir. . . . Back then, we used what they call road graders. And they would come down it and shape it and fix it so that the bus could come down, and they made a turn stop there at the house for the bus to turn around.

. . . .

Q: Was there any utilities run down that road at all?

A: No down the road, no, sir, but there was utilities at the house.

Q: Okay. Was there a meter there at the house?

A: There still is a meter at the house, a transformer and a power line.

The Webbs' son, Barry Webb, confirmed this. He testified:

Well, over the years I've used the road. From the time I was a child with Mom and Dad, I can remember Dad and us riding over in the tractor and

3

the trailer down that road and down into the corn field to pick corn by hand.
. . .

There was a family that lived there in the seventies, the Trombleys. They lived back in Mr. Rogers' shack, we called it. . . . And the young girl, Gloria, was a few years younger than me. And the school bus would go back and pick her up, and I've seen that several times. Later on, her boyfriend, and I think later her husband, . . . would drive back and forth down there to see her.

I've seen the county road graders come through ever so often, you know, maybe once a year or so, while the Trombleys live there to straighten the road back up and get it in good shape.

I've seen the other property owners use it as well. . . . [O]ver the years, anybody that had a need to go back there and actually some that didn't have a need to be back there were going back there on that road.

Mr. Webb testified about the logging that has taken place on his properties over the years. Shortly after he purchased Webb #1, Inland Container logged his property. He testified that they "used this public road to remove the materials because there's no access across Fourteen Creek." Mr. Webb explained further that the parcels now known as Webb #2 and Webb #3 were logged in 1982 by the owner at the time and that the gravel road was used to transport the timber off the property.

The warranty deed to the Douglases references "a county gravel road" in the legal description of their property. The gravel road in question appears on a map of Benton County dated 1920 as a "secondary road." A topographical map of the area referred to as "Seventeen Creek Quadrangle," prepared by the United States Tennessee Valley Authority in 1950, shows the gravel road as well. It is marked on the 1950 map as an "unimproved road, fair or dry weather." A certificate of survey dated 1982 identifies the gravel road as a county gravel road.

The Douglases contend the gravel road is not a county road because "the road in dispute has no name, no road sign, no dedication, no acceptance, no county resolution opening or closing it, it has never been on the county road list, no utilities installed along it, no name label on any map, and was closed with a locked gate installed by plaintiffs Webb in 1986."

Barry Webb testified about the gate that was installed. Barry explained that the

4

landowners whose properties abutted the gravel road agreed that Mr. Webb could install a fence where the road met the Old Natchez Trace Trail to prevent uninvited teenagers and other members of the public from driving down the gravel road and trespassing on the Webbs' and the other landowners' properties to drink and have parties. The other landowners were not sure the county would agree for Mr. Webb to install a gate, but if the county agreed, the other landowners did not object so long as they each had a key to the lock on the gate.

Barry testified that he went to speak with the road supervisor for Benton County on behalf of his father. Barry explained that the road supervisor gave Barry permission to put up the gate. Barry testified:

Q:     All right. As a part of the construction of the gate, had your father agreed that he'd be in charge of the maintenance of the road or take care of the maintenance of the road?

A:     Yes. That was the only stipulation the county had was that they would not come through the gate to maintain the road . . . .

Barry explained that after meeting with the road superintendent, he installed the gate for his father and gave a key to all the landowners who used the gravel road to access their properties. Barry explained further:

[T]hat was the way it worked is everybody . . . jointly had control of the gate. They could give keys to whomever they wanted, however many keys they wanted to. They didn't have to check with any other landowners about who they're letting back there. Everybody retained all the rights to their own property just the way it had always been.

Barry testified that the gate stayed up except when one of the property owners' lands was being logged and the trucks needed more space to get their trucks onto or off of the gravel road. Barry explained, "So from time to time, if anybody needed to take the gate down to do something, we took it down; but other than that, we ran under the agreement that we'd all had together that we keep the gate up."

When the Douglases purchased their property in December 2009, Mr. Douglas decided he did not want anyone other than he and his wife to use the gravel road. Mr. Douglas testified that he wanted to use the gravel road as his personal driveway and he intended to build a house across the road where it continued to Mr. Webbs' properties. Mr. Douglas took the position that there were no recorded easements on the property he

5

purchased and that he believed the other landowners had ways other than the gravel road to access their properties.

After purchasing his property, Mr. Douglas removed the Webbs' lock and placed a lock of his own on the gate. Mr. Douglas then proceeded to destroy the road to make it impassable by digging big pits at each end of the road where it crossed his property, placing a large pile of dirt in the middle of the road, and laying trees across the road to act as a roadblock.

## PROCEDURAL BACKGROUND

The Webbs filed a complaint in April 2010 seeking a declaration that the gravel road is a public road, or, in the alternative, that the Webbs have an easement to use the gravel road for ingress and egress. The Webbs also sought a temporary injunction requiring the Douglases to remove the obstacles they had placed in the road and a permanent injunction preventing the Douglases from interfering with the Webbs' or their designees' access to and use of the roadway. The Webbs sought compensatory and punitive damages as well resulting from the Douglases' actions.

On May 10, 2010, the trial court granted the Webbs' motion for a temporary injunction. The court ordered the Douglases to "restore the disputed roadway to the condition that it was in prior to this dispute having arisen with the Plaintiffs and those persons possessing written authorization from the Plaintiffs to have continuing access across the disputed road . . . ."

Mr. Douglas took steps to clear the road of obstacles and debris, as the trial court ordered. However, once the road was reopened and Mr. Webb was able to access it, Mr. Webb's truck sank into what he called a "pit" or a "trap" that he claimed Mr. Douglas had intentionally placed in the gravel road. Mr. Douglas denied knowing there was a hollow spot along the road and denied any intention to cause harm to Mr. Webb or his vehicle. Mr. Webb testified that his truck was damaged as a result of falling into the pit and that he was not able to repair it completely. Mr. Webb explained that he "traded it off" because he was unable to have the truck repaired to his satisfaction. Mr. Webb provided evidence that his truck lost value in the amount of $1,500 as a result of the damage it sustained from falling into the pit.

Mr. Webb also testified that he had established some hay fields in September 2009. Mr. Webb explained that he purchased fertilizer, seed, and lime, and that he planted fields covering ten acres that were only accessible by way of the gravel road. As a result of Mr. Douglas's blockage of the road, Mr. Webb was unable to harvest his crop of clover and wheat hay in the spring of 2010, when it was time to be harvested. Mr. Webb provided

6

documentary evidence of what he spent to prepare the fields and plant this crop. The total amount Mr. Webb asked the court to award him for the loss of these crops was $5,789.45.

TRIAL COURT'S JUDGMENT

The trial court entered a judgment in January 2014, finding for the Webbs. The court found the following facts, *inter alia*:

1. The road in question in its present location was a county road as far back as 1922; and although at some point it ceased to be worked by Benton county, this cessation does not mean the road is not a public road. It has been a public road and at some time it ceased being such.

2. The law in Tennessee is that once a public road ceases to be a public road, it becomes a private road for the benefit of the adjoining land owners. The road in question has, therefore, become a private road for the benefit of adjoining landowners.

3. In order to make the record complete, there is also a finding hereby made that Buddy Webb and wife, Shelby Webb, and their predecessors have used the road prescriptively and, thus, have also acquired the right to use the road by prescription.

. . . .

5. Brent Douglas and Jennifer [Douglas] have damaged Buddy Webb and wife, Shelby Webb, in the amount of SEVEN THOUSAND, TWO HUNDRED EIGHTY-NINE AND 45/100 ($7,289.45) DOLLARS ($1,500 for diminution in value of truck and $5,789.45 for crop loss), for which let execution issue if necessary on the property of Douglas.

6. This case is not appropriate for punitive damages [or] for attorney's fees.

The court then ordered, decreed, and awarded the following, in relevant part:

B. Buddy Webb and wife, Shelby Webb, are declared to have a permanent easement appurtenant to their properties . . . Webb 1, Webb 2, Webb 3, and Webb 4, as the dominant estates and said easement to be appurtenant as the servient estate across and encumbering Douglas, Webb 2, Webb 4, and Webb 1.

. . . .

D.    Buddy Webb and wife, Shelby Webb, have the right to use said easement for ingress and egress and to allow invitees to use the easement . . . .

E.    The parties shall have the right to gate the road on their own property; but, if on the Douglas property, only by permission of Douglas and Webb, or their successors, and under terms on which they agree. Buddy Webb and wife, Shelby Webb, have the right to maintain the road, but only to the extent of its being a gravel road of the width it is as of the date of the hearing. No gate or posts shall be a width which impedes access along the way as has been used by the owners.

F.    Brent Douglas and wife, Jennifer Douglas, are strictly prohibited from interfering with the use of the road by Buddy Webb and wife, Shelby Webb, and their invitees, and from the Webbs' maintenance of the road.

G.    Buddy Webb and wife, Shelby Webb, are hereby awarded a judgment against Brent Douglas and wife, Jennifer Douglas, in the amount of SEVEN THOUSAND, TWO HUNDRED EIGHTY-NINE AND 45/100 ($7,289.45) DOLLARS, for which let execution issue if necessary.

In its oral ruling from the bench, the trial court opined that the existence of a public road can be established by any competent evidence, oral or written. It is not necessary, according to the trial court, that the road be officially recognized by the public authorities. Thus, the fact that there was no public dedication or official record by the county showing the gravel road's status as a public road does not mean the road was not at one time a public road.

The Douglases appeal the trial court's decision. They argue that the trial court erred in finding that the gravel road constituted a public road. They also contend the trial court erred in determining that the Webbs acquired a prescriptive easement to use the road for ingress and egress because, according to the Douglases, the landowners whose property abutted the road entered into an oral agreement regarding the use of the road.

8

ANALYSIS

The Court of Appeals reviews the trial court's findings of fact de novo, according the trial court a presumption of correctness, unless the preponderance of the evidence convinces the Court otherwise. Tenn. R. App. P. 13(d); *Kelly v. Kelly*, No. E2012-02219-SC-R11-CV, 2014 WL 4437671, at *5, ___ S.W.3d ___, ___ (Tenn. Sept. 10, 2014); *Allstate Ins. Co. v. Tarrant*, 363 S.W.3d 508, 515 (Tenn. 2012). Review of questions of law is de novo, with no presumption of correctness granted to the trial court's rulings. *Kelly*, 2014 WL 4437671, at *5, ___ S.W.3d at ___; *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013).

Gravel Road

The Douglases are correct that no evidence was introduced showing that the gravel road was ever included on any list of roads maintained by Benton County. However, our Supreme Court explained nearly 80 years ago that "[t]he fact of the existence of a public highway may be proved or disproved by any competent evidence, either written or parol." *Current v. Stevenson*, 116 S.W.2d 1026, 1027 (Tenn. 1938) (citation omitted) (cited with approval by *Cartwright v. Bell*, 418 S.W.2d 463, 470 (Tenn. Ct. App. 1967)); *see Hackett v. Smith Cnty.*, 807 S.W.2d 695, 699 (Tenn. Ct. App. 1990) ("The failure of public officials to expressly accept a dedication will not defeat that dedication if there has been use by the general public."); *see also* 39A C.J.S. *Highways* § 124 (2014) ("[W]here a highway becomes public by public use, parol evidence may be used to establish that fact without first showing whether there is record evidence of the highway as such."). The *Current* Court explained,

> In the absence of evidence to show the establishment of a highway by public authority, it is made out at common law by showing that the public have used and enjoyed it, and their actual occupation of it for a considerable space of time, without interruption, affords a strong presumption of a right to use it, and a much shorter period of possession will suffice to indicate a right in the public, than to show that a private person has a right to the estate of which he is possessed.

116 S.W.2d at 1027 (quoting *Elkins v. State*, 21 Tenn. 543, 544 (Tenn. 1841)); *see Gibbs Bros. Constr., Inc. v. Brook Hollow Green, LLC*, No. M2003-01698-COA-R3-CV, 2005 WL 905775, at *5 (Tenn. Ct. App. Apr. 19, 2005) (stating road may be implicitly accepted as public road based on public's ongoing use of it).

The documentary evidence introduced at trial refers to the gravel road variously as a "county gravel road," a "gravel road," a "secondary road," and an "unimproved road." The gravel road appears on some maps and not on others. The testimony was undisputed that

9

logging trucks used the gravel road to reach the properties owned by the Webbs and their predecessors and to carry the timber off these same parcels. Other testimony was disputed. Mr. Webb and his son testified that county graders maintained the road until the gate was erected in 1986. Other witnesses testified that the county vehicles did not maintain the road. Mr. Webb and his son testified that a school bus regularly drove down the gravel road to pick up and drop off a school-aged child in the 1970s who lived on the property referred to as Webb 3. Another landowner who lived in the area denied that a school bus ever drove down the gravel road.

Mr. Webb and his son Barry testified that they and the family that resided in the dwelling situated at the end of the road, on Webb 3, regularly used the gravel road to reach their properties and that their invitees used the road as well. Even one of the Douglases' predecessors-in-interest testified that at some point, when he owned the property, uninvited members of the public were using the road to reach a shack that was being used as a "beer joint."

"[T]rial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges." *Kelly*, 2014 WL 4437671, at *5, ___S.W.3d at __. As a result, appellate courts defer to a trial court's resolution of factual disputes. *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *Davis v. Davis*, 223 S.W.3d 233, 238 (Tenn. Ct. App. 2006).

Our review of the transcript and the exhibits convinces us that the evidence does not preponderate against the trial court's determination that the gravel road was once a public road.[2] We recognize that the evidence was somewhat conflicting, but we are not in a position to disregard the trial court's implicit determination of the witnesses' credibility.

Having determined that the gravel road was a county road, we next consider the effect the gate had on the Webbs' right to continue using the road for purposes of ingress and egress. Barry Webb testified that when he went to speak with the individual he believed was the road commissioner for Benton County in 1986, he understood that the county would not continue to maintain the gravel road if a gate was installed.

The law is well-settled in Tennessee that "the abandonment of a county road and even

---

[2]The Douglases' reliance on Tenn. Code Ann. § 54-10-201, to support their argument that the gravel road could not be a county road because the statutory requirements were not followed, is misplaced. Although the statute prescribes the steps that must be followed when a petition is filed seeking to open, change, or close a road, the case law is clear that petitions are not the only way for a road to become a public road.

10

the authorization to close it could not affect private rights of abutting landowners to easements of access." *Cartwright v. Bell*, 418 S.W.2d 463, 470 (Tenn. Ct. App. 1967). The *Cartwright* court relied in part on *Paschall v. Valentine*, 321 S.W.2d 568 (Tenn. Ct. App. 1958), which explained:

> [A]ssuming that there was an abandonment of the old road as a public highway, it did not, and could not, affect the private right of the complainants, as abutting landowners, to an easement of access to their premises over the old road.

*Id.* at 570. The Court of Appeals has reaffirmed this rule of law more recently. In *Hall v. Pippin*, 984 S.W.2d 617 (Tenn. Ct. App. 1998), this Court wrote: "Owners of property abutting a once public road continue to have a private access easement over that road to their property even after the road loses its character as a public road." *Id.* at 620.

The Douglases do not dispute this rule of law, but they contend the Webbs must show they have no other way to access their property before they are entitled to an easement over the Douglases' property. The Douglases cite *Lay v. Wallace*, No. W2011-02285-COA-R3-CV, 2013 WL 654360 (Tenn. Ct. App. Feb. 21, 2013), in support of their argument. According to the *Lay* court, "[t]he landowner's easement . . . is limited to such streets or ways as are necessary to the landowner's ingress or egress." *Lay*, 2013 WL 654360, at *12 (quoting *Ty Farming Co., Inc. v. Belew*, No. 93-285, 1996 WL 649173, at *4 (Tenn. Ct. App. Nov. 8, 1996)). The *Lay* court addressed the meaning of the term "necessary," however, by explaining that "strict necessity" is not required. Rather, "the degree of necessity must be more than 'mere convenience.'" *Id.* (citations omitted). As the court explained, "'Where the claimant has another reasonable or practicable mode of ingress or egress, this Court will not imply a way of necessity.'" *Id.* (citations omitted).

We find the Webbs have provided sufficient proof to show the gravel road is "necessary" for them to access Webb #2, Webb #3, and Webb #4. Although Webb #1 borders Old Natchez Trace Trail, there is a creek labeled Fourteen Creek that runs through Webb #1 in a north/south orientation. Mr. Webb and others testified that Fourteen Creek is a substantial creek and there is no bridge that crosses the creek. Webb #2, Webb #3, and Webb #4 are to the east and south of Webb #1, and, other than the gravel road, the only way to reach them from Old Natchez Trace Trail would be by crossing Fourteen Creek. Although one witness testified that it was possible to drive a four-wheel drive vehicle across parts of Webb #1 to reach the other parcels, this witness admitted that he got stuck while trying to do this, even while driving a four-wheel drive vehicle. It is undisputed that there is no road other than the gravel road at issue that can be used to reach Webb #2, Webb #3, or Webb #4. We conclude that the Webbs have established that they have no practicable mode of ingress

11

or egress to these three parcels of property other than by way of the gravel road; thus, they have proved the necessity of using the gravel road at issue. *See Lay*, 2013 WL 654360, at *12.

The trial court properly applied the rules of law to the facts of this case when it concluded (1) that the Webbs have a permanent easement along the gravel road where it crosses the Douglases' property for purposes of ingress and egress to and from their properties and (2) that their invitees have the same right to use the easement where it crosses the Douglases' property to reach the Webbs' properties. Accordingly, we affirm the trial court's judgment in this regard.[3]

## Damages

The trial court awarded the Webbs $5,789.45 for damages they sustained when they were unable to harvest their hay crop in the spring of 2010 as a result of the Douglases' interference with their access to the gravel road. The Douglases challenge the trial court's award of this amount to the Webbs, claiming the Webbs did not take appropriate steps to mitigate their damages. The Douglases do not offer any suggestion of how the Webbs could have mitigated their damages. The Webbs had already put time and money into the preparation and planting of the fields before the Douglases purchased their property and blocked the road. The only thing left to do in the spring of 2010 was to harvest their crops. Without a way to bring the necessary equipment to the fields to harvest their crops, we do not know what steps the Webbs could have taken to mitigate their losses once the crops were ready to be harvested. The Douglases do not challenge the amount of damages the Webbs seek due to the loss of their crops. We, therefore, affirm this award.

We turn now to the court's award to the Webbs of $1,500 for diminution in value to Mr. Webb's truck. The evidence shows Mr. Webb's truck sank into a pit in the gravel road after the Douglases were ordered in May 2010 to restore the road to its former condition. Mr. Douglas denied intentionally creating a pit or trap in the road. The record contains no proof that Mr. Douglas took steps to create a pit or trap or that he intended to cause harm to Mr. Webb or his truck. However, the record does contain evidence that prior to the time when the Douglases tore up the road, the gravel road was in good condition and that large trucks carrying timber drove along the road without incident. It is reasonable to conclude that if not for the Douglases' disruptive activities tearing up and blocking the road, no pit or trap would have been created, and Mr. Webbs' truck would not have been damaged in the way it was.

---

[3]In light of our holding that the gravel road was a county road and that the Webbs have a permanent easement to use the road for purposes of ingress and egress, we need not address the trial court's alternative holding that the Webbs also acquired a prescriptive easement to use the road.

The Douglases do not contest the amount of damages the trial court awarded the Webbs for the diminution in Mr. Webb's truck. We, therefore, affirm the trial court's award of $1,500 to the Webbs for the damage they sustained to their truck.

CONCLUSION

We affirm the trial court's award of damages and its judgment that the Webbs and their invitees have a permanent easement to use the gravel road for ingress and egress. Costs of this appeal are assessed against the appellants, Brent Douglas and Jennifer Douglas, for which execution shall issue, if necessary.

_____
ANDY D. BENNETT, JUDGE



Attachment to Decree
Benton Chancery No 2206

Old Natchez Trace Trail

Webb 2

Douglas

Webb 1

Webb 4

Webb 3

Former dwelling

Easement to
Harry Seratt #3
& Buddie Webb #

Bald Knob Road

**Legend**

Property Boundary
Current County Road
Current Deeded Easements